IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BANCA POPOLARE DI NOVARA

*Plaintiff,*

v.

MANUFACTURERS AND
TRADERS TRUST COMPANY

*Defendant.*

Civil Action No.: ELH-11-736

## MEMORANDUM OPINION

Banca Popolare di Novara ("Banca"), plaintiff, is a bank organized under the laws of the Italian Republic ("Italy"), with its principal place of business in Novara, Italy.[1]  Complaint ("Compl.," ECF 1) ¶ 2.  Banca financed the purchase of an Italian "assembly line of stone cutting machinery" (the "Equipment") by a Pennsylvania quarrier and fabricator, BS Quarries, Inc. ("Quarries"), from the manufacturer of the Equipment, Effe Meccanica Srl ("Effe"), an Italian company.  *Id.* ¶¶ 7, 16.  Quarries made a downpayment to Effe, with the balance to be paid in five biannual installments, evidenced by five promissory notes (each a "Note" and collectively, the "Notes").[2]  *Id.* ¶¶ 7-10.  Effe then assigned the Notes to Banca, as it had financed the transaction.  *Id.* ¶ 16.  Because each Note was "payable at "M&T Bank" in New York, "the procedure by which Plaintiff would collect on each [N]ote was to use the services" of Manufacturers and Traders Trust Company ("M&T"), defendant, a bank organized under the laws of the State of New York, as the "collecting bank."  *Id.* ¶¶ 2, 17.  It is the collection process,

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

[2] Effe is no longer in business.  Compl. ¶ 7.

handled by M&T's branch office at 25 So. Charles Street in Baltimore ("Baltimore Branch"), which gave rise to the instant suit.

Banca has asserted three claims against M&T:  breach of contract (Count I); breach of fiduciary duty (Count II), pursuant to Md. Code (2002 Repl. Vol., 2010 Supp.), § 4-202 of the Commercial Law Article ("C.L."); and negligence (Count III).  Plaintiff seeks to recover almost $800,000 in compensatory damages from M&T, along with punitive damages.

M&T has filed a Motion To Dismiss Counts II and III of plaintiff's Complaint ("Motion," ECF 5), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Banca opposes the Motion.[3]  *See* Memorandum In Support of Defendant's Motion To Dismiss Counts II And III Of The Plaintiff's Complaint, ECF 5-1 ("Motion Memo."); Plaintiff's Response in Opposition to Defendant's Motion to Dismiss Counts II and III of Plaintiff's Complaint, ECF 10 ("Opp'n" or "Opposition"); and Reply In Support Of Defendant's Motion To Dismiss, Counts II and III of the Plaintiff's Complaint, ECF 11 ("Reply").  The issues have been fully briefed and the Court now rules pursuant to Local Rule 105.6, no hearing being necessary.

### Factual and Procedural Background[4]

At the relevant time, Quarries was "a quarrier and fabricator of a sandstone used for paving and related purposes, with its principal facility located in Montrose, Susquehanna

---

[3] M&T has also filed an Answer (ECF 6) to Count I of plaintiff's Complaint.

[4] Given the procedural posture of this case, the Court must "accept the well-pled allegations of the complaint as true," and "construe facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Bass v. E.I. du Pont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir.), *cert. denied*, 540 U.S. 940 (2003).

County, Pennsylvania."[5]  Compl. ¶ 7.  On or about November 7, 2007, Quarries purchased the Equipment (the "Transaction") from Effe, a company located in Italy that specialized in the manufacture and sale of stone cutting machinery.  *Id.*

The total cost of the Equipment was 1,300,000 euros.  Quarries made a downpayment to Effe of 266,500 euros, leaving a balance of 1,033,500 euros to be repaid, with interest, in five biannual payments.  *Id.* ¶¶ 8-9.  The payment arrangement was reflected in five promissory notes, in which Quarries was identified as the payor and Effe as the payee.  *Id.* ¶¶ 10, 12.  The Notes "were in varying amounts with maturity dates approximately every six months starting in March 2009."  *Id.* ¶ 12.  Each Note specified:  "This promissory note is payable at M&T Bank,  2 Court Street, Binghamton, NY . . . ."  *Id.* ¶ 11.

Each Note "was in an international format duly issued by Quarries."  *Id.* ¶ 13.  Each one was to be "deposited in trust" with Banca thirty days prior to shipment of the Equipment, "with irrevocable instructions to release the Notes to Effe against Effe's presentation of shipment documents confirming that Quarries had received the Equipment."  *Id.*

On or about March 25, 2008, Effe shipped all of the Equipment, in one shipment, from Italy to Quarries' facility in Pennsylvania, where "the entire shipment" was received.  *Id.* ¶ 14.  Accordingly, Effe presented to Banca its shipment documents, including a confirmation of Quarries' receipt of the Equipment, and Banca "released the Notes to Effe."  *Id.* ¶ 15.  As Banca financed the Transaction, Effe "assigned all rights and title to each of the Notes to [Banca]," as "reflected by Effe's endorsement on the back of each [N]ote."  *Id.* ¶ 16.

---

[5] The record does not reflect whether Quarries is still in business.

As indicated, because each Note was "payable at M&T Bank. . . .", Banca utilized M&T

Bank as its "collecting bank." *Id.* ¶ 17.  As the maturity date for each Note approached, Banca

sent that Note to M&T, with instructions "over bank wire" to "collect" each Note on the Note's

maturity date.  *Id.* ¶ 19.  To facilitate this collection process, "each [N]ote was endorsed on its

reverse side from [Banca] to [M&T]."  *Id.* ¶ 18.  The collection instructions sent by Banca

contained the following pre-printed language:

> This Order is to be executed in accordance with the "Uniform Rules for
> Collection" (1995 Revision) issued by the International Chamber of Commerce
> (Brochure n.522) insofar as these are applicable[.]

Opp'n 7, 15 (citing Banca's Compl. Exh. 1-5); *see* Compl. Exhs. 7, 12, 16, 18.

On March 16, 2009, Banca sent the first Note ("Note 1"), due on March 25, 2009, to

M&T's Binghamton, New York office, with instructions for collection.  *Id.* ¶ 19.  The

instructions stated:

> DRAFT FOR COLLECXTION [sic] AT MATURITY.  PROTEST FOR NON
> PAYMENT.  YOUR COMMISSIONS AND CHARGES ARE FOR DRAWEE'S
> ACCOUNT[.]  IF REFUSED DO NOT DELIVER THE DRAFT.   PLEASE
> ACKNOWLEDGE RECEIPT ADVISE PAYMENT NON PAYMENT BY
> SWIFT TO NVRBIT2N.

*Id.* ¶ 20; Compl. Exh. 7.   Thus, pursuant to the instructions, M&T was required first to

"acknowledge" the receipt and the amount of Note 1, and then "advise" Banca whether it had

received payment.

Forty-five days later, on or about April 30, 2009, M&T responded, by bank wire from its

"Trade Services Department" at its Baltimore Branch, acknowledging the amount due for Note

1.[6]  *Id.* ¶ 21.  By bank wire to Banca dated May 4, 2009, forty days after Note 1's maturity date

(March 25, 2009), M&T stated, in part:

> PLEASE BE ADVISED THAT YOUR PROMISSORY NOTE HAS BEEN
> RECEIVED.   WE ARE NOW IN THE PROCESS OF COLLECTING
> PAYMENT FROM THE DRAWEE.   WE WILL TRANSFER FUNDS PER
> YOUR   INSTRUCTIONS   WHEN   WE   RECEIVED   PAYMENT
> AUTHORIZATION.

Compl. Exh. 9.

On May 19, 2009, Banca sent a message to M&T, requesting a status update on the

collection of Note 1.   Compl. ¶ 23.   M&T responded by bank wire, dated May 21, 2009,

indicating that it had "forward[ed] the information to [Quarries] for payment," and that M&T

would "contact [Quarries] and request information" as to "when payment will be made."  *Id.*

¶ 24; *see* Compl. Exh. 11.

On or about September 1, 2009, Banca sent M&T the second Note ("Note 2"), due on

September 25, 2009, with instructions for collection.  Compl. ¶ 25.  The instructions provided:

> DRAFT FOR COLLECTION AT MATURITY.    PROTEST FOR NON
> PAYMENT.  YOUR COMMISSIONS AND CHARGES ARE FOR DRAWEE'S
> ACCOUNT,  IF REFUSED DO NOT DELIVER THE DRAFT.    PLEASE
> ACKNOWLEDGE RECEIPT.  KINDLY ADVICE [sic] US PAYMENT NON
> PAYMENT BY SWIFT.

*Id.*; *see* Compl. Exh. 12.

By bank wire to Banca dated September 10, 2009, M&T acknowledged Note 2.  Compl.

¶ 26.  Three days after Note 2's maturity date, on September 28, 2009, M&T sent another bank

wire to Banca, acknowledging Note 2 and indicating that the "DATE OF COLLECTION

---

[6] Unless otherwise indicated, all correspondence between Banca and M&T was sent to and from the Trade Services Department at M&T's Baltimore Branch.

INSTRUCTIO [sic]" was September 1, 2009, against Quarries as drawee.  *Id.* ¶ 27; *see* Compl.

Exh. 14.

By bank wire dated November 17, 2009, Banca contacted M&T to request a status update

as to the collection of Note 2.  Compl. ¶ 28.  That message stated, in part:

> AS UP [sic] TODAY WE HAVE NOT RECEIVED PAYMENT, OR NOTICE
> OF PROTEST AS REQUESTED IN OUR REMITTANCE SCHEDULE
> PLEASE LET US KNOW URGENTLY THE PRESENT STATUS OF THIS
> MATTER AND STATE THE REASONS OF THE DELAY.
> YOUR PROMPT ANSWER WILL BE APPRECIATED.

Compl. Exh. 15.[7]

On or about March 1, 2010, Banca sent M&T the third Note ("Note 3"), due on March

25, 2010, with instructions for collection.  *Id.* ¶ 29.  The instructions provided:

> PROMISSORY NOTE FOR COLLECTION AT MATURITY.  PROTEST FOR
> NON PAYMENT.   YOUR COMMISSIONS AND CHARGES ARE FOR
> DRAWEE'S ACCOUNT, IF REFUSED DO NOT DELIVER THE DRAFT.
> PLEASE ACKNOWLEDGE RECEIPT AND ADVISE US BY SWIFT TO OUR
> NVRBITN PAYMENT NON PAYMENT.

*Id.*; *see* Compl. Exh. 16.

By bank wire on March 31, 2010, M&T contacted Banca, acknowledging receipt of Note

3 and the "DATE OF COLLECTION INSTRUCTIO [sic]" as March 1, 2010, against Quarries.

Compl. ¶ 30.

On or about August 25, 2010, Banca sent M&T the fourth note ("Note 4"), due on

September 25, 2010, with instructions for collection.  *Id.* ¶ 31.  The instructions provided:

> PROMISSORY NOTE FOR COLLECTION AT MATURITY.  PROTEST FOR
> NON PAYMENT.   YOUR COMMISSIONS AND CHARGES ARE FOR
> DRAWEE'S ACCOUNT,  IF REFUSED DO NOT DELIVER THE DRAFT.

---

[7] The record does not reflect whether M&T responded to this message.

> PLEASE ACKNOWLEDGE RECEIPT AND ADVISE US BY SW TO OUR NVRBIT2N PAYMENT NON PAYMENT.

*Id.*; *see* Compl. Exh. 18.

By bank wire message on September 8, 2010, i.e., prior to the due date for Note 4, M&T informed Banca that it was "RETURNING THE COLLECTION DOCUMENTS" for Note 4 "FOR REASON OF UNCOLLECTIBLE." Compl. ¶ 32; *see* Compl. Exh. 19. Then, by two bank wire messages dated September 14, 2010, M&T informed Banca that it was returning Notes 1 and 2 "FOR REASON OF UNCOLLECTIBLE." Compl. ¶ 33; *see* Compl. Exhs. 20-21. A bank wire message, dated September 16, 2010, reported the same circumstances with respect to Note 3. Compl. ¶ 33. According to Banca, Note 1 was returned 538 days after its maturity date; Note 2 was returned 354 days after its maturity date; Note 3 was returned 175 days after its maturity date; and Note 4 was returned about two weeks before its maturity date. *Id.* ¶¶ 32-34.

Banca avers that, based on M&T's representations and delays in communications, Banca never received payment in satisfaction of the Notes. *Id.* ¶¶ 35, 49. Moreover, Banca avers that Quarries had the ability to make payment at the time that Notes 1, 2, and 3 matured. *Id.* ¶ 36. In addition, Banca alleges that, "at the time [Banca] engaged [M&T] as a collecting bank . . . [M&T] was a lender to Quarries to the extent of approximately $20 million." *Id.* ¶ 53. Banca also asserts that M&T "was collateralized against Quarries' real property and other assets," and thus "had a strong self-interest in assisting Quarries to preserve its cash flow, accounts payable and liquid assets." *Id.* ¶ 53; Opp'n 8. According to Banca, it had no knowledge that M&T was a lender to Quarries. *Id.* ¶ 53.

Efforts by Banca to collect payment from Quarries have been unsuccessful. *Id.* ¶ 37. This suit followed. M&T demands judgment from M&T for $788,963.02, an amount that

represents the sum of Notes 1, 2, and 3, "converted to US currency at the Wall Street Journal exchange rate on each of their due dates." *Id.* ¶¶ 50, 64. Banca also seeks pre-judgment and post-judgment interest and costs. *Id.* ¶ 50, 56, 64. In addition, Banca seeks $2 million in punitive damages with respect to its claim for breach of fiduciary duty (Count II).

Additional facts will be included in the discussion, as relevant.

## Discussion

### I.

Under FED. R. CIV. P. 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the Rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555-56 n.3 (2007) (citation omitted).

To be sure, the plaintiff need not include "detailed factual allegations in order to satisfy" Rule 8(a)(2). *Id.* at 555. But, the Rule demands more than bald accusation or mere speculation. *Id.* Thus, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient under the Rule. *Id.*

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6). *German v. Fox*, 267 F. App'x 231, 233 (4th Cir. 2008). Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009), make clear that, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 129 S. Ct. at 1953 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions. . . .'" (citation omitted)); *see also Simmons v. United Mortgage and Loan Inv.*, 634 F.3d

754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v.*

*Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

However, a motion pursuant to Rule 12(b)(6) "does not resolve contests surrounding the

facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178

F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). Moreover, in resolving a Rule

12(b)(6) motion, the court is not required to accept legal conclusions drawn from the facts. *See*

*Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*, 579 F.3d

380, 385-86 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 1740 (2010). To satisfy the

minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken

as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is

improbable and . . . recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556. Thus,

where the "well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct," the complaint has not shown that "'the pleader is entitled to relief.'" *Iqbal*, 129 S.

Ct. at 1950 (citation omitted).

Plaintiff has appended several exhibits to the Complaint and, in connection with its

Motion, M&T has provided the Court with a copy of the Uniform Rules for Collections. In

deciding a motion to dismiss, a court may consider any document that is a matter of public

record as well as exhibits attached to the complaint. *Anheuser-Busch v. Schmoke*, 63 F.3d 1305,

1312 (4th Cir. 1995) (citing 5B Charles A. Wright & Arthur R. Miller, Federal Practice

and Procedure § 1357 (3d ed. 2004)); *see also CACI Int'l, Inc. v. St. Paul Fire & Marine Ins.*

*Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (stating, in regard to a Rule 12(b)(6) motion, "the Fourth

Circuit has held that courts may consider the complaint itself and any documents that are

attached to it.  This circuit has also held that courts may consider a document that the defendant attaches to its motion to dismiss if the document 'was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity.'" (citations omitted))

## II.

As noted, pursuant to Rule 12(b)(6), M&T has moved to dismiss Banca's claims for breach of fiduciary duty and negligence.  It contends that, by agreement of the parties, the collection process for the Notes was governed by the Uniform Rules for Collections, 1995 Revision, Publication No. 522, promulgated by the International Chamber of Commerce in accordance with accepted international collection procedures.[8]  Motion Memo. 6.  According to M&T, its duties as a collecting bank were not governed by Article 4 of the Maryland Uniform Commercial Code ("UCC"), Md. Code (2002 Repl. Vol., 2010 Supp.) § 1-101 *et. seq*. of the Commercial Law Article ("C.L.").  Motion Memo. 6-7.  M&T maintains that the parties' agreement as to the applicability of URC 522 supplanted application of the non-mandatory provisions of the UCC, such as "the midnight deadline rule. . . ."  Motion Memo. 9; Reply 3, 6.

M&T explains that the UCC's domestic check collection provisions are too stringent to be applied in an international context, which requires more flexibility, *id.* at 4-5, and that, "by incorporating URC 522 into its instructions, Banca Popolare altered the normal collection rules contained in [C.L.] § 4-202[9] and substituted more appropriate international standards in place of the domestic standards set forth in the UCC."  Reply at 6.  It asserts, Motion Memo. 2:

---

[8] As will be discussed, *infra*, URC 522, is a model set of principles created by a nongovernmental organization that sets forth international standards for collections.  It must be contractually adopted by the parties in order for it to apply.  Of import, URC 522 requires that collecting banks "act in good faith and exercise reasonable care."  Motion Exh. 2, art. 9.

[9] The text of C.L. § 4-202 appears on page 13, *infra*.

The duties imposed upon a bank handling an international collection item subject to URC 522 are minimal.  Essentially, the bank's duties are limited to presenting the item to the obligor for payment and remitting any payment received to the transmitting bank or notifying the transmitting bank that no payment was received.  Failure to properly perform those duties and obligations would, at most, give rise to a breach of contract claim.

Nevertheless, M&T maintains that it "is not seeking to avoid the application of any non-disclaimable provisions of the UCC."  Reply 9.  Nor does it contend "that the incorporation of URC 522 relieved M&T Bank from any obligation to act in good faith or use ordinary care."  *Id.* at 7.  In its view, the "statutory obligations under the UCC . . . conflict with URC 522" and "dramatically expand both the scope of M&T Bank's duties and obligations to Banca Popolare . . . ."  Motion Memo. 2.  Therefore, it contends that it is merely "seeking to hold Banca Popolare to the terms of its contract," in which the parties agreed that URC 522 would govern.  Reply 7.

M&T recognizes that, under URC 522, a collecting bank is required to "act in good faith and exercise reasonable care" in handling a collection item.  Reply 7 (quoting URC 522, Art. 9).  But, M&T insists that its obligations to Banca are solely contractual, and not "extra-contractual," so as to permit a recovery in tort.  *Id.* at 10.  Thus, it insists that the "economic loss doctrine bars" plaintiff's negligence claim.  *Id.*

Further, M&T posits that neither URC 522 nor the UCC impose fiduciary duties on M&T, and the circumstances of the collection relationship reflect that it was an arm's length business transaction, for which a fiduciary relationship is inapplicable.  Motion Memo. 10-11.  Moreover, M&T asserts that Maryland does not recognize a cause of action for breach of fiduciary duty when other remedies exist, such as a breach of contract claim, as asserted in Count

I.  *Id.* at 13.  In any event, asserts M&T, Banca has failed to allege actual malice with respect to M&T's conduct, and therefore, its claim for punitive damages must fail.  *Id.* at 13-14.

Banca concedes that the parties agreed that URC 522 would govern the collection process.  Nevertheless, it maintains that several provisions of Maryland's UCC, particularly those giving rise to statutory and fiduciary duties, cannot be waived, continue to apply, and give rise to the counts in the suit.  Opp'n 13, 19.  Banca argues that the facts, as pled, along with the applicable law, give rise to its claims for breach of fiduciary duty, negligence, and entitlement to punitive damages.

According to Banca, under the UCC, M&T, as the collecting bank, was Banca's agent, and, as Banca's agent M&T owed Banca a fiduciary duty.  *Id.* at 13-14.  Further, Banca maintains that Maryland law permits a cause of action for breach of fiduciary duty.  *Id.* at 10.  Banca also asserts that C.L. § 4-202 is binding in its entirety upon the parties and, by statute, sets forth the applicable standard of care, which M&T breached.  *Id.* at 13-14.

In Banca's view, M&T's failure to perform the collection process in a timely manner prejudiced Banca's ability to recover payment from Quarries.  *Id.* at 14.  Moreover, Banca posits that M&T's relationship with Quarries, as a secured lender, constituted a conflict of interest, and the Complaint "contains sufficient factual allegations to show that Defendant acted with the requisite wrongful motive to injure the Plaintiff."  *Id.* at 21.

### A.  Negligence

Title 4 of Maryland's UCC, C.L. § 4-101 *et seq.*, governs "Bank Deposits and Collections."  Notably, C.L. § 4-103(a) states:

> The effect of the provisions of this title may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of

good faith or failure to exercise ordinary care or limit the measure of damages for lack or failure.  However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

*See also Lema v. Bank of Am., N.A.*, 375 Md. 625, 636, 826 A.2d 504, 510 (2003) ("We have recognized the ability of parties by contract to alter the effect of provisions of the UCC . . . .").

Under C.L. § 4-202, titled "Responsibility for collection or return; when action timely," a collecting bank is required to exercise ordinary care.  It states, in part:

(a) A collecting bank must exercise ordinary care in:

(1) Presenting an item or sending it for presentment;

(2) Sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be;

(3) Settling for an item when the bank receives final settlement; and

(4) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

(b) A collecting bank exercises ordinary care under subsection (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.

(c) Subject to subsection (a)(1), a bank is not liable for the insolvency, neglect, misconduct, mistake, or default of another bank or person or for loss or destruction of an item in the possession of others or in transit.

It is undisputed that the parties contractually agreed that URC 522 would apply to the collection process.  The URCs are a set of principles created by a nongovernmental organization, the International Chamber of Commerce.

Collecting banks handling international collection items "operate solely as conduits," and do not "guarantee payment or assume credit risks." *Monarch Gems, J.B. v. Malca-Amit USA,*

*LLC*, No. 04-C-7664, 2007 WL 2892636, at *9 (N.D. Ill. Sept. 27, 2007).  URC 522 sets forth standards for collection, *Gathercrest, Ltd. v. First Am. Bank & Trust*, 649 F. Supp. 106, 114 (M.D. Fla. 1985), *aff'd*, 805 F.2d 995 (11th Cir. 1986), and has no binding effect unless expressly incorporated into the text of a "collection instruction."  Motion Exh. A ("URC 522"), art 1.a.  When incorporated into the text of a "collection instruction," however, URC 522 becomes "binding on all parties . . . unless otherwise expressly agreed or contrary to the provisions of a national, state or local law and/or regulation which cannot be departed from."  *Id.*

Pursuant to URC 522, "[a]ll documents sent for collection must be accompanied by a collection instruction indicating that the collection is subject to URC 522 and giving complete and precise instructions."  *Id.*, art. 4.a.i.  Where, as here, the collecting bank is also the bank that is presenting an instrument to the drawee or obligor for payment, URC 522 provides: "Expressions such as «first», «prompt», «immediate», and the like should not be used in connection with presentation or with reference to any period of time within which documents have to be taken up or for any other action that is to be taken by the drawee."  *Id.*, art. 5.b. Further, "[d]ocuments are to be presented to the drawee in the form in which they are received." *Id.*, art. 5.c.  And, "the presenting bank must, where acceptance is called for, make presentation for acceptance without delay, and where payment is called for, make presentation for payment not later than the appropriate maturity late."  *Id.*, art. 6.  "Amounts collected (less charges and/or disbursements and/or expenses where applicable) must be made without delay to the party from whom the collection instruction was received . . . ."  *Id.*, art. 16.  In addition, collecting banks "are to advise fate" of payment, non-payment, acceptance, or non-acceptance, "without delay." *Id.*, art. 26.

As indicated, application of URC 522 does not preclude application of the UCC altogether; certain UCC provisions cannot be disclaimed. *See, e.g.,* C.L. § 4-103(a). Indeed, Article 1 of URC 522 makes clear that non-variable and non-disclaimable portions of the UCC remain applicable in the context of an international collection. It provides that the provisions of URC 522 shall be binding "unless otherwise expressly agreed or contrary to the provisions of a national, state or local law and/or regulation which cannot be departed from." However, where a provision of the UCC can be disclaimed or varied by agreement, the effect of the parties' adoption of URC 522 is to supersede those provisions, where applicable. *See SCADIF, S.A. v. First Union Nat'l Bank*, 208 F. Supp. 2d 1352, 1373 (S.D. Fla. 2002) (holding that the UCC's "midnight deadline rule," the Maryland equivalent of which is contained in C.L. § 4-302, was inapplicable because it could be varied by the parties' agreement, and the parties had adopted URC 522), *aff'd*, 344 F.3d 1123 (11th Cir. 2003). *See, e.g., Bank One Dearborn, N.A. v. Wachovia Bank, N.A., et al.*, No. 03-6575, 2005 U.S. Dist. LEXIS 413, at *11-20 (E.D. Pa. 2005) (holding that UCC warranty of presentment, which, by its language, could not be disclaimed, was still in effect, despite the parties' contractual adoption of URC 522); *Integrated Measurement Sys., Inc. v. Int'l Commercial Bank of China*, 757 F. Supp. 938, 949 (N.D. Ill. 1991) (holding that the parties' contractual adoption of the "Uniform Customs and Practice for Documentary Credits" could not override certain provisions of the UCC because, by their terms, they could not be disclaimed or varied). *Cf. Trans Meridian Trading Inc. v. Empresa Nacional de Comercializacion de Insumos*, 829 F.2d 949 (9th Cir. 1987) (holding that the parties' contractual adoption of an ICC banking practice rule, known as the "Uniform Customs and Practice for Documentary Credits," did not preclude application of California's UCC).

Of import here, Article 9 of URC 522 states:  "Banks will act in good faith and exercise reasonable care."  As one court has observed (and as the parties seem to recognize), the standard of care under URC 522 is "essentially identical" to the standard set forth in what is title 4 of Maryland's UCC.  *Thiagarajar Mills, Ltd. v. Thornton*, 47 F. Supp. 2d 918, 925 (W.D. Tenn. 1999) ("[T]he standard of care is the same under both the URC and the [equivalent New York UCC provision].*"), *aff'd*, 242 F.3d 710 (6th Cir. 2001).

With this background, I turn to the motion to dismiss the claim for negligence.

In order to maintain a suit for negligence, a defendant must be under a duty to protect a plaintiff from injury.  *Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010). Maryland courts have characterized a "duty" as "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'"  *Id.* at 120, 991 A.2d at 94 (quoting *Gourdine v. Crews*, 405 Md. 722, 745, 955 A.2d 769, 783 (2008)). An imposition of a "duty" reflects a policy determination that the specific plaintiff was "entitled to protection from the acts of the defendant."  *Blondell*, 413 Md. at 120, 991 A.2d at 94.

It is well established that "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'"  *Id.* at 120-21, 991 A.2d at 94 (quoting *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986)); *see also Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999) ("A contractual obligation, by itself, does not create a tort duty.  Instead, the duty giving rise to a tort action must have some independent basis.").  Notably, "when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any

contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy." *Mesmer*, 353 Md. at 254, 725 A.2d at 1059. In contrast, "when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the *appropriate standard of care*, . . . the plaintiff may, in some circumstances, maintain a tort action." *Id.*

Maryland courts have allowed negligence suits for violation of the UCC's duty of care. *Schultz v. Bank of Am.*, 413 Md. 15, 28, 990 A.2d 1078, 1086 (2010); *Taylor v. Equitable Trust Co.*, 269 Md. 149, 155-56, 304 A.2d 838, 841-42 (1973) ("'Nowhere in the [UCC] does it say in so many words that a bank, whether a collecting bank or payor bank, is liable for negligently paying an item. Hints, however, abound.'" (citation omitted)); *cf. Sun Trust Bank/Miami N.A. v. First Nat'l*, 698 F. Supp. 1298, 1304 (D. Md. 1988) (applying contributory negligence to suit based on alleged negligence in breach of the UCC's standard of care). Moreover, "[t]here is no contradiction in allowing a party to enforce the duty of ordinary care through a contract claim, a tort claim, or both." *Schultz*, 413 Md. at 38 n.21, 990 A.2d at 1092 n.21. The Maryland Court of Appeals has said: "[A]lthough the proof required and the measure of compensatory damages allowable may be essentially the same under either cause of action, there are other considerations, including requirements of venue and limitations on the bringing of actions, that make it desirable to provide a choice of actions." *Jacques*, 307 Md. at 545, 515 A.2d at 765); *accord Schultz*, 413 Md. at 38 n.21, 990 A.2d at 1092 n.21. For instance, "where actual malice is shown, punitive damages may be awarded in a tort action but not in an action for breach of contract." *Jacques*, 307 Md. at 545, 515 A.2d at 765.

M&T argues that the standard of care applicable here was established entirely by contract (URC 522), and cannot form the basis of a tort suit.  However, as indicated, the UCC's standard of care cannot be varied by agreement.  *See* C.L. § 4-103(a).  In my view, M&T's position would circumvent the express, non-disclaimable terms of the UCC's duty of good faith and ordinary care, set forth in C.L. § 4-103(a).  Although URC 522 may have altered the procedures for collection, and sets forth obligations as to due care, it does not relieve a party of its duty of good faith and ordinary care under the UCC.  Therefore, it does not necessarily bar a negligence claim.

For these reasons, I shall deny M&T's motion to dismiss the negligence claim (Count III).

### B.  Breach of Fiduciary Duty

M&T also contends that Banca cannot maintain a cause of action for breach of fiduciary duty under Maryland law.

"A fiduciary relationship exists when one party is under a duty to act or give advice for the benefit of another."  PAUL MARK SANDLER & JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND § 3.209.A, at 436 (4th ed. 2008) (citing RESTATEMENT (SECOND) OF TORTS § 874 cmt. a (1979); RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. b (1959)).  Moreover, "[o]ne who breaches his or her duty as a fiduciary may be liable under various causes of action to those harmed by the breach of that duty."  *Id.*  However, the cases and commentary indicate that a claim for breach of fiduciary duty exists "where the breach is alleged as an element of the cause of action – not as a separate cause of action itself."  *Id.*[10]

---

[10]  Paul Sandler and James Archibald, the authors of *Pleading Causes of Action in Maryland,* have said:  "The circuit courts follow this interpretation, yet plaintiffs continue to

In *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), the Maryland Court of Appeals

said, *id.* at 713, 690 A.2d at 521:

> [T]here is no universal or omnibus tort for the redress of breach of fiduciary duty
> by any and all fiduciaries. This does not mean that there is no claim or cause of
> action available for breach of fiduciary duty. Our holding means that identifying a
> breach of fiduciary duty will be the beginning of the analysis, and not its
> conclusion. Counsel are required to identify the particular fiduciary relationship
> involved, identify how it was breached, consider the remedies available, and
> select those remedies appropriate to the client's problem.

Later, in *International Brotherhood of Teamsters v. Willis Corroon Corp.*, 369 Md. 724,

801 A.2d 1050, (2002), the Court of Appeals explained, *id.* at 727 n.1, 801 A.2d 1052 n.1:

> In *Kann v. Kann*, 344 Md. 689, 713, 690 A.2d 509, 520-21 (1997), we pointed out
> that, although the breach of a fiduciary duty may give rise to one or more causes
> of action, in tort or in contract, Maryland does not recognize a separate tort action
> for breach of fiduciary duty. Based on the underlying averments, IBT may have
> been able to plead an action for breach of contract, in addition to its claim for
> negligence, but it chose not to do so. We shall treat the complaint as one for
> negligence.

*See also Vinogradova v. Suntrust Bank*, 162 Md. App. 495, 510, 875 A.2d 222, 231 (2005)

("[U]nder Maryland law, the two separately pleaded claims in [the] complaint," i.e., a claim for

negligence and a claim for breach of fiduciary duty, "condense to only one: the claim based on

the tort of negligence.").

To be sure, the post-*Kann* landscape has been a bit muddled.  In *McGovern v. Deutsche*

*Post Global Mail, Ltd.*, JFM-04-0060, 2004 U.S. Dist. LEXIS 15215, at *37-38 (D. Md. Aug. 4,

2004), Judge Motz stated:

> Courts have not entirely agreed on how to interpret the language of *Kann*.
> *Compare Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190

---

(...footnote continued)

allege (unsuccessfully) breach of fiduciary duty as it sown cause of action."   SANDLER &
ARCHIBALD, *supra*, at § 3.209.A, at 438.

F. Supp. 2d 785, 801 (D. Md. 2002) (breach of fiduciary duty can be part of other causes of action, but no independent tort for breach of fiduciary duty, especially if alternative remedies available), *Kerby v. Mortgage Funding Corp.*, 992 F. Supp. 787, 803 (D. Md. 1998) (no universal tort of breach of fiduciary duty, at least where other remedies exist), *and Bresnahan v. Bresnahan*, 115 Md. App. 226, 235, 693 A.2d 1, 5 (1997) ("in light of Kann, it is doubtful that *Hartlove* [*v. Maryland School for the Blind*, 111 Md. App. 310, 681 A.2d 584 (1996), *vacated*, 344 Md. 720 (1997),]'s creation of an independent tort of breach of fiduciary tort [sic] has survived")(dictum), *with Garcia v. Foulger Pratt Develop., Inc.*, 155 Md. App. 634, 682, 845 A.2d 16, 44 (2003) (*Kann* means that whether there is a tort for breach of fiduciary duty must be determined on a case-by-case basis), *and BEP, Inc. v. Atkinson*, 174 F. Supp. 2d 400, 405-06 (2001) (plaintiff did state claim for breach of fiduciary duty because requirements set forth in *Kann* were satisfied).

Further, Judge Motz observed that, "[e]ven in cases where it appeared that courts were recognizing the tort of breach of fiduciary duty, the breach of the particular fiduciary duty at issue actually constituted a separate, cognizable cause of action," such as breach of the duty of loyalty between employer and employee or agent and principal. *Id.* at *38-38. He concluded, *id.* at *38: "I am persuaded that a careful reading of *Kann* and its progeny leads to the conclusion that breach of fiduciary duty can give rise to a cause of action – that is, it can be a component of a cause of action – but it cannot be a cause of action standing alone."

The recent case of *Wasserman v. Kay*, 197 Md. App. 586, 14 A.3d 1193 (2011), is also instructive. There, the plaintiff sought, *inter alia*, money damages for breach of contract, negligence, and breach of fiduciary duty. *Id.* at 631, 14 A.3d at 1219. The Maryland Court of Special Appeals noted that Maryland law does not, at present, "obliterate the possibility of a separate cause of action for breach of fiduciary duty in an action seeking equitable relief." *Id.* However, it went on to state, *id.*: "In a claim for monetary damages at law . . . an alleged breach of fiduciary duty may give rise to a cause of action, but it does not, standing alone, constitute a cause of action." In affirming the circuit court's ruling to dismiss that count, the Maryland

appellate court concluded that the allegations in the plaintiff's breach of fiduciary duty claim were "relevant to other causes of action," such as the breach of contract or negligence causes of action, but they did not "constitute a stand alone nonduplicative cause of action." *Id.* at 631-32, 14 A.3d at 1219; *see also McGovern*, 2004 U.S. Dist. LEXIS 15215, at *40 ("That is, under *Kann*, there is no independent tort for breach of fiduciary duty, but such a breach may give rise to a cause of action if a particular duty is identified and there is an available remedy for that breach.").

As the cases and commentary make clear, any purported breach of fiduciary duty for monetary damages cannot, standing alone, constitute a separate and distinct cause of action under Maryland law for breach of fiduciary duty. Accordingly, I will dismiss Count II of the Complaint.

### C.  Punitive Damages[11]

It is well established in Maryland that "punitive damages cannot be awarded in a pure breach of contract case, although they are recoverable in tort actions arising out of contractual relationships where actual malice is present." *Sims v. Ryland Group, Inc.*, 37 Md. App. 470, 475, 378 A.2d 1, 4 (1997); *see Wasserman*, 197 Md. App. at 636, 14 A.3d at 1222; *see also Biktasheva v. Red Square Sports, Inc.*, 366 F. Supp. 2d 289, 295 (D. Md. 2005) ("In Maryland, punitive damages are not available in a pure action for breach of contract, even if the breach is

---

[11] Banca's demand for punitive damages is contained in its claim for breach of fiduciary duty. Compl. ¶ 56. However, its claim for negligence incorporates by reference the Complaint's prior allegations. *Id.* ¶ 57 ("Plaintiff repeats and realleges each allegation in paragraph '1' through '56' as if fully set forth herein."). Therefore, despite the dismissal of Count II, which contains the demand for punitive damages, I will address punitive damages, because that prayer for relief is incorporated into the negligence claim set forth in Count III.

malicious.  In a tort action, a plaintiff must prove that a defendant had actual malice in order to obtain punitive damages." (citations omitted)).

Maryland courts have defined "'actual malice' as 'conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud.'" *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 264, 841 A.2d 828, 837 (2004) (quoting *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460, 601 A.2d 633, 652 (1992)); *see also Biktasheva*, 366 F. Supp. 2d at 296 ("Actual malice 'has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" (citation omitted)).  Thus, "'negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual malice].'" *Darcars Motors of Silver Spring, Inc.*, 379 Md. at 264, 841 A.2d at 837 (alteration in original) (quoting *Owens-Illinois, Inc.*, 325 Md. at 463, 841 A.2d at 837).  Actual malice must be established by clear and convincing evidence.  *Darcars Motors of Silver Spring, Inc.*, 379 Md. at 264, 841 A.2d at 837; *see Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 652, 709 A.2d 1222, 1226 (1998).

It is abundantly clear that plaintiff's causes of action do not support a claim for punitive damages.  Banca has not alleged any facts that constitute "actual malice."  Banca's allegation that, "[a]s a consequence of [M&T's] lender-borrower customer relationship with Quarries, [M&T] knowingly, intentionally, and with malice, disregarded its fiduciary duty," does not amount to actual malice.  Even if M&T had an interest in protecting the continued viability of Quarries, for its own financial benefit, Banca has not indicated how such self interest means that M&T acted with animus toward Banca.

Accordingly, I will strike Banca's demand for punitive damages, but will grant Banca leave to amend within 15 days of the docketing of the accompanying Order.

Date: August 26, 2011                    /s/_____
                                         Ellen Lipton Hollander
                                         United States District Judge